IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RYAN SCOTT LAPISH,  : Civil No. 1:24-CV-1346
:
    Plaintiff,  :
:
      v.  :
: (Chief Magistrate Judge Bloom)
LELAND DUDEK, Acting  :
Commissioner of Social Security,[1]  :
:
    Defendant.  :

## MEMORANDUM OPINION

## I. Introduction

Ryan Lapish filed an application for disability benefits on February 10, 2021. Following a hearing before an Administrative Law Judge ("ALJ"), the ALJ found that Lapish was not disabled from his alleged onset date of October 2, 2019, through the date of the ALJ's decision, February 21, 2024.

Lapish now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. After a review of the record, we

---

[1] Leland Dudek became the Acting Commissioner of the Social Security Administration on February 19, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Leland Dudek is substituted as the defendant in this suit.

conclude that the ALJ's decision is not supported by substantial evidence. Therefore, we will remand this matter for further consideration by the Commissioner.

## II. <u>Statement of Facts and of the Case</u>

Ryan Lapish filed for disability insurance benefits, alleging disability due to a history of traumatic brain injuries and post-traumatic stress disorder ("PTSD"). (Tr. 102). He alleged an onset date of disability of October 2, 2019. (*Id.*). Lapish was 32 years old at the time of his alleged onset of disability, had at least a high school education, and had past work as a truck driver and mechanic. (Tr. 27).

The medical record regarding Lapish's impairments[2] revealed that Lapish was an active-duty service member in the United States Marine Corps from 2006 to 2012. (*See e.g.*, Tr. 370). During his time in the Marines, Lapish suffered several traumatic brain injuries and concussions due to blast exposures. (Tr. 553, 555). He was diagnosed with a mild cognitive disorder, PTSD, and a history of alcohol

---

[2] Because Lapish's appeal focuses on his mental health impairments, we limit our discussion of the medical records to those impairments.

abuse/dependence. (Tr. 551). In 2009, he reported persistent issues with his memory and mood, as well as daytime fatigue and irritability. (Tr. 556). Lapish received an honorable discharge from the Marines in February of 2012. (Tr. 370). According to records from the Department of Veterans Affairs ("VA"), in October of 2019, Lapish was considered totally and permanently disabled due to his service-connected disabilities. (Tr. 370).

In February of 2020, Lapish contacted the VA in Philadelphia, Pennsylvania for support after expressing concern about his newborn daughter and her health issues. (Tr. 735). Lapish began treatment in March with psychologist Karen Loaiza for his PTSD, anxiety and adjustment disorder with depressed mood,. (Tr. 734). His mood was low to fair, but this thought progression was appropriate and goal directed, and he exhibited a cooperative attitude and behavior. (*Id.*). He denied thoughts of suicide. (*Id.*). However, in March following several missed appointments, Lapish voluntarily entered an inpatient treatment program after reporting that he abused methamphetamines. (Tr. 729-32). He admitted to abusing cocaine in the past after losing his job in

2018. (Tr. 716). He further reported that he had pending criminal charges for possession of a controlled substance. (*Id.*). Lapish was discharged from the program on March 26, 2020, with a scheduled telehealth follow up visit. (Tr. 710). Discharge treatment notes indicate that his dysphoria present on admission had largely resolved, and that his severe anxiety and PTSD symptoms were improving. (Tr. 705). Lapish had several follow-up phone calls with the VA because his admission to a residential facility was on hold due to COVID-19. (Tr. 708-09).

Treatment notes from April indicate that Lapish was experiencing significant stressors related to his criminal charges. (Tr. 701, 706). His mood was "not great," and he reported passive suicidal ideation. (Tr. 707). However, later in April, Lapish expressed that he was doing well and feeling motivated after moving in with his grandfather. (Tr. 700). Lapish continued psychotherapy treatment in May, at which time he had a low to fair mood, normal thought content, and a cooperative attitude and behavior. (Tr. 689). In June, Lapish reported that his mood improved since ending a relationship and moving to Philadelphia, and

that he remained sober. (Tr. 667). In July, Lapish was evaluated for participation in an intensive outpatient program for PTSD and was determined to be an appropriate candidate. (Tr. 659). Lapish reported that he was running daily, cooking often, and trying to garden. (Tr. 655). A mental status examination revealed a fair mood, appropriate thought progression, normal thought content, and a cooperative attitude. (*Id.*).

Lapish began the virtual intensive outpatient treatment program in August of 2020, which included both individual and group therapy. (Tr. 651). It was noted that his PTSD symptoms included nightmares, anxiety, intrusive thoughts, and feeling on guard. (Tr. 648). Lapish was fully oriented and alert, and had good eye contact, appropriate speech, and logical thought processes. (Tr. 351). A group therapy note from later in August indicates that Lapish was attentive to the group and exhibited a high degree of collaboration and euthymic mood. (Tr. 628-29). Around this time, Lapish reported that he had plans to begin online classes to pursue a bachelor's degree in business administration. (Tr. 630). Similar mental status findings were noted in an individual therapy note from September 1, 2020, identifying Lapish as fully oriented, alert,

having good eye contact, a euthymic mood, appropriate speech, and logical thought processes. (Tr. 625). Later in September, it was noted that Lapish continued to cope with his legal stressors, but that he was focused on self-improvement, education, and improving his relationship with his significant other. (Tr. 610). Lapish successfully completed the outpatient program and was discharged on September 18, 2020. (Tr. 598).

Lapish continued to treat with Dr. Loaiza for individual psychotherapy in September, and it was noted that Lapish began and was enjoying school. (Tr. 595). Lapish also reported reducing his alcohol intake. (*Id.*). Treatment notes from October indicate that Lapish was using healthy coping tools to manage his stress, including processing his experiences rather than avoiding them. (Tr. 593). In November, Lapish reported having dreams related to his trauma and apparent trust issues. (Tr. 588). Lapish further reported in December that he ended his relationship with his significant other and was moving but was focusing on getting his apartment together, school, and staying in contact with those who were supportive. (Tr. 587).

6

Treatment notes from January of 2021 indicate that Lapish continued to focus on school, and that he planned a road trip to visit families of friends who died in combat. (Tr. 582, 584). In February, Lapish established care with the VA in Wilkes Barre, Pennsylvania, where he requested a mental health consultation for depression, PTSD, and alcohol abuse. (Tr. 568).

Lapish underwent a mental status evaluation with Dr. Andrew Cole, Psy.D., in April of 2021. (Tr. 774-78). Dr. Cole noted Lapish's hospitalization for substance abuse in 2020, as well as his outpatient treatment. (Tr. 774). Lapish reported difficulty falling asleep, flashbacks, nightmares, avoidance, and hypervigilance, as well as past suicidal thoughts. (Tr. 775). He further reported his legal problems, including his charges for possession of a controlled substance and alleged child abuse. (Tr. 776). On examination, Lapish was cooperative, appropriately dressed and well groomed; he exhibited restless motor behavior, fluent speech, coherent and goal directed thought processes, and a bright and energetic affect; he reported feeling good, his attention, concentration, and memory skills were intact, and his insight and

judgment were adequate. (Tr. 776-77). He further reported an ability to perform personal care, cook, clean, and drive, and that he did not socialize. (Tr. 777). Dr. Cole opined that Lapish had mild limitations in understanding, remembering, and carrying out complex instructions; moderate limitations in interacting with others; and no limitations in his abilities to manage himself or concentrate, persist, and maintain pace. (Tr. 778-80).

Lapish continued to treat with Dr. Loaiza around this time, and reported feeling like he was on a positive trajectory with his mood and relationships. (Tr. 794-95). He continued to report anxiety around large groups of people and people he did not know. (Tr. 795). Dr. Loaiza noted Lapish's continued distress regarding his legal issues but that he tried to "avoid dwelling on it." (Tr. 794). However, in May of 2021, Lapish reported increased anxiety after he abruptly stopped taking his medication. (*Id.*). Dr. Loaiza noted in June that Lapish was experiencing sleep disturbances and intrusive thoughts related to missing his children. (Tr. 884). Lapish reported reducing his alcohol intake and engaging with family. (*Id.*). Treatment notes from July indicate that

Lapish was actively engaged in goal-directed behavior and frequently interacting with family and neighbors. (Tr. 883).

In November of 2021, Lapish underwent a psychological evaluation at the VA Medical Center in Coatesville. (Tr. 1035-42). Lapish reported that his depressive symptoms made it difficult to do work, take care of his home, and get along with others. (Tr. 1035). He recounted his military service in Afghanistan and his legal troubles with his daughter. (Tr. 1036-37). He further reported his history of substance abuse. (Tr. 1037). A mental status examination revealed that Lapish was fully alert and oriented; exhibited a dysphoric and anxious mood and a constricted affect; and his cognitive functioning was within normal limits. (Tr. 1039-40). The PTSD clinical staff recommended evidence-based psychotherapy. (Tr. 1040).

Lapish was incarcerated in December of 2022 related to his criminal charges of child abuse. (*See e.g.*, Tr. 1130). At his initial intake screening, Lapish was alert and oriented; tearful but relaxed and cooperative; and exhibited normal speech, a depressed and anxious mood, and normal thought content. (Tr. 1137-39). He also reported a past

9

suicide attempt in 2020 where he attempted to overdose on his medication. (Tr. 1142). Lapish underwent another mental status examination at the prison in April of 2023, which revealed relatively unremarkable findings. (Tr. 1148-49). While he was incarcerated, Lapish received medications but in May, requested to get off his medications. (Tr. 1292).

Following his release from prison, Lapish reestablished care with the VA in October of 2023 and requested treatment with behavioral health for his PTSD. (Tr. 1458 and 1464). In December, a mental status examination revealed normal psychomotor activity, an anxious mood and congruent affect, logical and goal-directed speech and thought processes, and no signed of disturbances. (Tr. 1443). Additionally, his insight and judgment were good, and his concentration, memory functioning, and intellectual functioning were considered average. (*Id.*). He declined psychotherapy in favor of treating elsewhere. (Tr. 1444).

Finally, Lapish underwent an updated mental status evaluation with Dr. Kyle Culver, Psy.D., in January of 2024.[3] (Tr. 1486-89). Dr. Culver noted Lapish's ongoing treatment with the VA, as well as his legal history and history of alcohol and substance abuse. (Tr. 1486-87). Lapish reported disrupted sleep, decreased appetite, dysphoric mood, fatigue, irritability, and loss of interest in usual activities. (Tr. 1487). He further reported short-term memory deficits, concentration difficulties, and decreased attention. (*Id.*). A mental status examination revealed a cooperative demeanor, fluent speech, neutral mood, average intellectual functioning, fair insight and judgment, and intact attention, concentration, and memory skills. (Tr. 1487-88). Dr. Culver opined that Lapish had moderate limitations in interacting with others, but no limitations in understanding, remembering, or carrying out instructions or in his ability to manage himself, concentrate, persist, or maintain pace. (Tr. 1490-91).

---

[3] The ALJ ordered this consultative examination, which he explained at the December 2023 hearing. (Tr. 42).

It was against the backdrop of this record that an ALJ held a hearing on Lapish's disability application on December 18, 2023.[4] (Tr. 38-72). Lapish and a Vocational Expert both appeared and testified at the hearing. (*Id*.). On February 21, 2024, the ALJ issued a decision denying Lapish's application for benefits. (Tr. 14-37). The ALJ first concluded that Lapish had not engaged in substantial gainful activity since October 2, 2019, his alleged onset of disability. (Tr. 20). At Step 2 of the sequential analysis that governs disability claims, the ALJ found that Lapish suffered from the following severe impairments: traumatic brain injury ("TBI"); PTSD; mild neurocognitive disorder; depressive disorder; polysubstance use disorder, in remission; and disorder of the spine. (*Id*.).

At Step 3, the ALJ concluded that none of these impairments met or equaled the severity of a listed impairment under the Commissioner's regulations. (Tr. 20-22). Specifically, the ALJ found that Lapish was only mild to moderately limited in the four areas of social functioning. (*Id*.).

---

[4] This was the fourth hearing scheduled in Lapish's case, the first three having been continued or postponed for various reasons, including Lapish's initial *pro se* status and his brief period of incarceration. (*See* Tr. 73-100).

The ALJ further concluded that Lapish did not meet all the requirements for Listing 12.15. (*Id.*).

Between Steps 3 and 4, the ALJ then concluded that Lapish:

[H]a[d] had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except unskilled work involving simple, routine tasks; simple decisions; occasional changes in the workplace; occasional interaction with co-workers and supervisors; and no direct public interaction.

(Tr. 22).

In reaching this RFC determination, the ALJ considered the objective record detailed above, the medical opinion evidence, and Lapish's reported symptoms. With respect to the medical opinion evidence, the ALJ considered the opinions of the state agency psychological consultants, Dr. Galdieri and Dr. Plowman, and found these opinions partially persuasive. (Tr. 27). These providers opined that Lapish had no more than mild to moderate limitations in the areas of social functioning, and that Lapish could perform one-to-two-step tasks on a consistent basis. (Tr. 106-12, 120-23). The ALJ reasoned that these opinions were supported by and consistent with the objective record and the providers' explanations but ultimately found that Lapish had

13

moderate limitations in concentration due to his ongoing PTSD treatment. (*Id.*).

The ALJ also considered the opinion of the examining consultants, Dr. Cole and Dr. Culver, and found these opinions partially persuasive. (Tr. 26). The ALJ noted these providers' limitations were generally supported by and consistent with their own relatively unremarkable examination findings. (*Id.*). However, with respect to Dr. Culver's opinion, the ALJ found that the record supported a mild limitation in understanding, remembering, and carrying out instructions, particularly given Lapish's ongoing treatment and complaints of memory deficits. (*Id.*). Similarly, with respect to Dr. Cole's opinion, the ALJ concluded that the record supported a moderate limitation in concentration and persistence limitations due to Lapish's reports of intrusive thoughts, flashbacks, and hypervigilance. (*Id.*).

With respect to Lapish's symptoms, the ALJ found that Lapish's statements concerning the intensity, persistence, and limiting effects of his impairments were not entirely consistent with the medical evidence. (Tr. 23). Lapish testified that he was briefly incarcerated on the charges

14

related to assault of his daughter and that he was awaiting a retrial. (Tr. 44-45). He stated that he was found 100% unemployable by the VA and received benefits. (Tr. 46). He reported he had past work as a truck driver and a mechanic. (Tr. 48). Lapish testified that he was unable to work due to his PTSD and TBIs, including issues he had with nightmares and difficulty sleeping which caused him to lose his job. (Tr. 49-50). He explained that he would get into a "funk" thinking about his experiences in the military, which caused episodes of anger and shutting down. (Tr. 50-51). Lapish further reported that he began therapy after being released from prison, and that he was working to control his anxiety. (Tr. 52). He testified that he experienced flashbacks and intrusive memories, and that he avoids triggers that remind him of his military trauma, such as war movies and firearms. (Tr. 56, 58). He further testified that he attempted suicide three times in the past, the most recent being an attempted overdose on his medication. (Tr. 59). However, he did not seek any treatment for his most recent suicide attempt. (Tr. 65).

The ALJ found Lapish's statements concerning the disabling level of his symptoms to be inconsistent with the objective clinical findings.

(Tr. 23). The ALJ recounted the medical evidence, including Lapish's psychotherapy treatment through the VA and the intensive outpatient program he completed. (Tr. 23-26). The ALJ noted Lapish's TBIs, his history of drug abuse, his reports of nightmares, flashbacks, suicide attempts, and abnormal examination findings in the record, such as a dysphoric mood and anxiety around others. (*Id.*). The ALJ further recounted the unremarkable findings during the relevant period, such as good moods, goal directed thought processes, normal eye contact, bright affect, and intact attention, concentration, and memory. (*Id.*). Finally, the ALJ considered Lapish's activities of daily living, including personal care, meal preparation, household chores, home renovation projects, and volunteering at his church. (Tr. 25). Ultimately, the ALJ concluded that Lapish was not as limited as he alleged and could perform work within the parameters of the RFC.

Having made these findings, the ALJ found at Step 4 that Lapish could not perform his past work but found at Step 5 that Lapish could perform the occupations of hand packager, lab equipment cleaner, floor cleaner, assembler, and marker. (Tr. 27-29). Accordingly, the ALJ found

that Lapish had not met the stringent standard prescribed for disability benefits and denied his claim. (Tr. 29).

This appeal followed. On appeal, Lapish argues that the ALJ erred in finding that he did not meet Listing 12.15, and further erred in his consideration of Lapish's RFC. In a more cursory and vague fashion, Lapish contends that the ALJ failed to consider the VA's findings of disability. This case is fully briefed and is therefore ripe for resolution. After consideration, and finding that the ALJ failed to give any consideration the VA's disability determination in this case, we conclude that the ALJ's decision is not supported by substantial evidence.[5] Accordingly, we will remand this matter for further consideration by the Commissioner.

## III.  Discussion

### A. Substantial Evidence Review – the Role of this Court

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decision-

---

[5] Individuals can receive both Social Security and VA disability benefits concurrently.

maker are supported by substantial evidence in the record. *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted). However, where there has been an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime*

*Comm'n*, 383 U.S. 607, 620 (1966). The court must "scrutinize the record as a whole" to determine if the decision is supported by substantial evidence. *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Under this standard, we must look to the existing administrative record to determine if there is "'sufficient evidence' to support the agency's factual determinations." *Id.* Thus, the question before us is not whether the claimant is disabled, but rather whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was based upon a correct application of the law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct

application of the law to the facts"); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

When conducting this review, we must remain mindful that "we must not substitute our own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we cannot re-weigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings. In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). This does not require the ALJ to use "magic" words, but rather the ALJ must discuss the evidence and explain the reasoning behind his or her decision with more than just conclusory statements. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted). Ultimately, the ALJ's decision must be accompanied by "a clear and

satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

## B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a). This requires a claimant to show a severe physical or mental impairment that precludes [him/her] from engaging in previous work or "any other substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination, the ALJ follows a five-step evaluation. 20 C.F.R. §§404.1520(a), 416.920(a). The ALJ must sequentially determine whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also determine the claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1). In making this assessment, the ALJ must consider all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2). Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by

substantial evidence. *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

The claimant bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents him or her from engaging in any past relevant work. *Mason*, 994 F.2d at 1064. If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination. While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, *see Biller v. Acting Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013), other courts have taken the approach that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6,

11 (3d Cir. 2006). Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision. Cases that emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence. *Biller*, 962 F. Supp. 2d at 778–79. These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination. On the other hand, when no medical opinion supports a disability finding or when an ALJ relies upon other evidence to fashion an RFC, courts have routinely sustained the ALJ's exercise of independent judgment based upon all the facts and evidence. *See Titterington*, 174 F. App'x 6; *Cummings,* 129 F. Supp. 3d at 214–15.

24

Ultimately, it is our task to determine, considering the entire record, whether the RFC determination is supported by substantial evidence. *Burns,* 312 F.3d 113.

## C. The ALJ's Decision is Not Supported by Substantial Evidence.

As we have noted, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests," *Cotter*, 642 F.2d at 704, and the ALJ must "indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999). After consideration, we conclude that the ALJ's RFC determination is not supported by an adequate explanation.

In this case, we are remanding this matter for a clear error in the ALJ's decision—a failure to consider Lapish's records from the VA regarding his disability and unemployability. While Social Security and VA benefit programs are separate and have different eligibility requirements, "disability determinations from other government agencies . . . must be considered." *Stancavage v. Saul*, 469 F. Supp. 3d 311, 335 (M.D. Pa. 2020) (citing *McCleary v. Colvin*, 187 F. Supp. 3d 497,

542 (M.D. Pa. 2016); 20 C.F.R. §§ 404.1504, 416.904).  "To 'consider' means to provide explanation sufficient for a 'subsequent reviewer to follow the adjudicator's reasoning.'"  *Id.* (quoting *McCleary*, 187 F. Supp. 3d at 542)).

Here, Lapish testified regarding the VA's finding of disability at the administrative hearing, and there are documents within the administrative record containing the VA's determination of disability. (*See e.g.*, Tr.  46, 370-73).  However, the ALJ's decision is completely silent as to these records.  Nowhere in the decision does the ALJ mention or consider the disability rating by the VA.  Therefore, there is no explanation from which we can "follow the adjudicator's reasoning" as to this agency disability determination.  Accordingly, we conclude that the ALJ's decision does not contain an adequate explanation, and as such, is not supported by substantial evidence.

Accordingly, a remand is required for further consideration. While we reach this conclusion, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on the ultimate outcome of this matter. Rather, that task is left to the ALJ on remand.

IV.   Conclusion

For the foregoing reasons, the decision of the Commissioner will be

REMANDED for further consideration.

An appropriate order follows.


Submitted this 3rd day of April 2025.


*s/ Daryl F. Bloom*
Daryl F. Bloom
Chief United States Magistrate Judge